RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

In re: CITY OF DETROIT, MICH.,

> *Debtor*.

———————————

MAURIKIA LYDA, JOHN SMITH, NICOLE HILL, ROSALYN WALKER, ANNETTE PARHAM, JANICE WARD, SYLVIA TAYLOR, SCOTT EUBANK, JOANNE JACKSON, and TAMMIKA R. WILLIAMS, individually and on behalf of all others similarly situated; MICHIGAN WELFARE RIGHTS ORGANIZATION; PEOPLE'S WATER BOARD; NATIONAL ACTION NETWORK – MICHIGAN CHAPTER; MORATORIUM NOW!,

> *Plaintiffs-Appellants*,

> *v*.

CITY OF DETROIT, MICH.; DETROIT WATER AND SEWERAGE DEPARTMENT,

> *Defendants-Appellees*.

No. 15-2236

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-10038—Bernard A. Friedman, District Judge.

Argued: August 2, 2016

Decided and Filed: November 14, 2016

Before: SUTTON, GRIFFIN, and DONALD, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Mark P. Fancher, ACLU FUND OF MICHIGAN, Detroit, Michigan, for Appellants. Marc N. Swanson, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellees. **ON BRIEF:** Mark P. Fancher, ACLU FUND OF MICHIGAN, Detroit, Michigan, Alice B. Jennings, EDWARDS & JENNINGS P.C., Detroit, Michigan, Kurt Thornbladh, THORNBLADH LEGAL GROUP PLLC, Dearborn, Michigan,

John C. Philo, MAURICE & JANE SUGAR LAW CENTER FOR ECONOMIC & SOCIAL JUSTICE, Detroit, Michigan, for Appellants. Marc N. Swanson, Jonathan S. Green, Sonal H. Mithani, Ronald A. Spinner, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellees.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. This appeal stems from an adversary proceeding in the City of Detroit's chapter 9 bankruptcy case. Plaintiffs are customers, and the purported representatives of customers, of the Detroit Water and Sewerage Department (DWSD). Relying primarily on 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), they filed a complaint alleging a series of claims arising from DWSD's termination of water service to thousands of residential customers. The legal theories underlying plaintiffs' claims are varied, but the relief requested uniform: "preliminary and permanent injunctive relief stopping water shut offs and restor[ing] service," and an order directing DWSD "to implement a water affordability plan with income based payments" for residential customers.

Section 904 of the Bankruptcy Code explicitly prohibits this relief. Whether grounded in state law or federal constitutional law, a bankruptcy court order requiring DWSD to provide water service at a specific price, or refrain from terminating service, "interfere[s]" with the City's "political [and] governmental powers," its "property [and] revenues," and its "use [and] enjoyment of . . . income-producing property." 11 U.S.C. § 904. Plaintiffs' due process and equal protection claims are, moreover, inadequately pled. Because plaintiffs cannot recover on their state-law or constitutional claims, we affirm the order of the district court affirming the bankruptcy court's order of dismissal.

I.

The City of Detroit filed for chapter 9 bankruptcy protection in July 2013. *See In re City of Detroit*, No. 13-53846 (Bankr. E.D. Mich. filed July 8, 2013). At the time, the City and its residents faced problems "run[ning] wide and deep"—including the affordable provision of basic

utilities.  In July 2014, plaintiffs filed an adversary complaint seeking to intervene in the case. As the district court explained:

> Plaintiffs are ten residents of the City of Detroit, Michigan, who are residential customers of the Detroit Water and Sewerage Department ("DWSD"), and four organizations who claim to "represent[] members throughout the City of Detroit who are residential customers of DWSD."  The individual plaintiffs allege that in 2013 or 2014 the DWSD turned off their water, or threatened to do so, because their water bills were in arrears.  Six of the plaintiffs indicate that their water service was turned off but then restored after they or their landlords paid a portion of the arrearage (generally one-third) and entered into payment plans, sometimes with advocacy assistance from one of the plaintiff organizations.  Of the other four individual plaintiffs, two say they could not afford to pay the arrearage or the terms of the payment plan, or both, and remain without water; and the other two avoided service interruption when they, or their landlord, entered into payment plans.  All plaintiffs find the cost of DWSD's water service to be unaffordable.

Plaintiffs purported to represent themselves and a proposed class of "all persons living in households who have been issued notices of water-shutoffs," and "who have had their water or sewerage service shutoff."

Their amended complaint included seven counts.  In Count I, plaintiffs alleged that terminating service constituted a "[b]reach of [e]xecutory [c]ontract[s]" in violation of 11 U.S.C. § 365.  In Count II, they alleged DWSD violated their procedural due process rights by terminating service "without sufficient prior notice, without the opportunity for a hearing, or without an effective post termination hearing process."  In Count III, they alleged DWSD violated their right to equal protection by "treating residential account holders in arrears differently than [delinquent] commercial account holders" who did not face termination of service.  In Count IV, they alleged defendants created a "public health emergency" in violation of the Michigan Constitution.  In Count V, they alleged estoppel, on the ground that customers reasonably relied on DWSD's former policy of "allow[ing] the accumulation of large unpaid water bills without shut-offs."  In Count VI, plaintiffs sought declaratory and injunctive relief enjoining the "mass water shut offs."  And in Count VII, they alleged defendants violated their rights as humans, and as beneficiaries of the public trust, to water.  Although not alleged in a specific count, the bankruptcy court also read the allegations to include a substantive due process claim for continued water service at an affordable rate.

With the exception of a request for costs and attorney's fees, plaintiffs prayed only for declaratory and injunctive relief, including: preliminary and permanent injunctions "stop[ping] all water shut offs and restor[ing] service to DWSD residential customers"; a declaration that DWSD's billing and shutoff procedures violated due process and equal protection rights, as well as the "human right to water" and the "public trust doctrine"; a declaration that the water provided by defendants is held in the public trust; and an order requiring "DWSD to implement a water affordability plan with income based payments for DWSD residential customers."

Shortly after initiating suit, plaintiffs moved for a temporary restraining order (TRO) requiring DWSD to restore service to residential customers and prohibiting further shutoffs. Defendants objected to the request and moved for dismissal. In support of their motion, defendants relied primarily on 11 U.S.C. § 904. That statute provides:

> Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
>
> (1) any of the political or governmental powers of the debtor;
>
> (2) any of the property or revenues of the debtor; or
>
> (3) the debtor's use or enjoyment of any income-producing property.

11 U.S.C. § 904. As defendants saw it, "§ 904 explicitly prevent[ed]" the bankruptcy court from granting the relief sought, regardless of the theory under which plaintiffs asserted their claims. "Since the Court cannot grant effectual relief to the Plaintiffs even if they prevail," defendants urged the court to dismiss the adversary proceeding. Insofar as § 904 did not resolve the matter, they argued that Counts I through VII failed to state a claim upon which relief could be granted.

Plaintiffs responded. They countered that as DWSD customers, they shared executory contracts with DWSD, and § 904 "do[es] not deprive the Court of supervision of assumption and rejection[] of executory contracts under Section 365 of the Bankruptcy Code." Plaintiffs argued the bankruptcy court could, and should, leverage this "supervis[ory]" authority to "compel Defendant[s] to assume executory contracts" including the relief sought.

The bankruptcy court held hearings on both motions. Delivering its initial ruling from the bench, the court granted defendants' motion to dismiss and denied plaintiffs' motion for a TRO.

In response, plaintiffs filed four motions for reconsideration, each of which included a request for permission to file a second amended complaint. Finding no palpable defect the correction of which would result in a different disposition of the case, *see* L.B.R. 9024-1(a)(3) (E.D. Mich.), the bankruptcy court denied the motions. It likewise denied plaintiffs' requests to amend as untimely. "However, in light of certain arguments plaintiffs raise[d]," the court found it "necessary to supplement and clarify" its earlier ruling. It stated:

> The Court concludes the City's motion to dismiss was properly granted, and thus the plaintiffs' several motions for reconsideration must be denied, for the following three reasons:
>
> (1) Under § 904 of the bankruptcy code, except as to the plaintiffs' constitutional claims, this Court lacks the authority to grant the injunctive relief requested.
>
> (2) While issues arising under § 365 of the bankruptcy code relating to executory contracts do fall within the Court's core jurisdiction, the relationship between DWSD and its customers is not an executory contract. Moreover, even if the relationship is an executory contract, the relief that the plaintiffs seek is outside of the scope of § 365 and is prohibited by § 904.
>
> (3) Although the plaintiffs' allegations of violations of due process and equal protection are not subject to § 904 because they are constitutional claims, they fail to state claims on which relief can be granted.
>
> Finally, the Court concludes, in the alternative, that the evidence presented at the hearing . . . does not establish that the Court should grant a preliminary injunction.

Plaintiffs appealed to the district court, challenging the bankruptcy court's decision *in toto*. The district court affirmed. It endorsed the bankruptcy court's resolution of each substantive claim. With respect to plaintiffs' request for a TRO, the court affirmed without considering the evidence in the alternative, because "[p]laintiffs are not entitled to any relief based on a complaint that fails to state a claim." Finally, it affirmed the denial of plaintiffs' "improperly asserted" request for leave to amend, which "was not supported by a brief or by a proposed [second] amended complaint."

Plaintiffs appeal. The only issue they do not contest is the bankruptcy court's dismissal of their executory contract claim.[1]

## II.

We begin with the question we posed at the outset of oral argument: whether this case is moot. After reviewing supplemental briefing on this point, we conclude it is not.

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013). Courts have "no business deciding legal disputes or expounding on law" without them. *Id.* (internal quotation marks omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (internal quotation marks omitted). "If events occur during the case, including during the appeal, that make it 'impossible for the court to grant any effectual relief whatever to a prevailing party,' the appeal must be dismissed as moot." *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 713 (6th Cir. 2011) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).

### A.

This case involves two intervening events. First, as the bankruptcy court noted in its supplemental opinion, "none of the plaintiffs are currently without water service." Following oral argument before this court, DWSD "conducted a search of its billing systems," and "found nothing to indicate that the status of any of the plaintiffs' water service has changed since the opinion was issued." Because plaintiffs received the injunctive relief they requested, *i.e.*, restoration of service, and did not seek damages, *see Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 8 (1978), defendants argue this appeal is moot. We disagree.

Plaintiffs "have sought, from the very beginning, declaratory relief as well as an injunction." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 121 (1974). They may retain an interest in obtaining a declaratory judgment if the challenged conduct is capable of repetition yet

---

[1]While neither lower court entered a judgment in this case, we have jurisdiction over the final order of the district court affirming the bankruptcy court's order of dismissal. *See* 28 U.S.C. § 158(d)(1).

evading review.  *Id.* at 122.  This doctrine permits suits for prospective relief to go forward in "exceptional situations," where:  (1) the challenged conduct is too short in duration to be fully litigated before it expires; and (2) there is a reasonable expectation that the same complaining party will again be subject to the same action.  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990) (citation omitted).  In this case, plaintiffs offered proof of both.  *See Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005) (the party seeking to avoid mootness "bears the burden of establishing both prongs").

At the hearing on plaintiffs' motion for a TRO, John Smith testified that DWSD terminated his water service for three to five months in early 2014.  Defendant restored Smith's service as of the date of the hearing, but scheduled another termination to begin the following day.  Maurikia Lyda testified that DWSD terminated her water service for just over a month between June and July of 2014, only to restore service on the day she filed suit.  Like Smith, Lyda had water at the time of the hearing, but she presented the court with a current shutoff notice and explained she was unable to pay the amount necessary to avoid another termination.  With their supplemental brief, plaintiffs presented an affidavit from Nicole Hill, who described three shutoffs between 2014 and 2016.  Hill cannot afford her August 2016 water bill and anticipates a fourth shutoff in the near future.  Thus, this controversy is not just "*capable* of repetition"—in Hill's case, it *is* repeating.  *Honig v. Doe*, 484 U.S. 305, 319 n.6 (1988); *see also e.g.*, *Barry v. Lyon*, 834 F.3d 706, 712–13, 715 (6th Cir. 2016) (finding "[t]he record fully supports th[e] conclusion . . . that the violation involved was capable of repetition but evading review," where the plaintiff experienced "repeated problems" maintaining his food assistance benefits).

Defendants argue otherwise.  They assert that the shutoffs are not capable of repetition "because DWSD has implemented the Water Residential Assistance Program," among other strategies, to keep water rates within reach of low-income Detroiters.  As defendants explain it, the WRAP "provides assistance to qualifying residential customers whose water service has been shut off or who have a past due bill.  It is designed to encourage long term self-sufficiency by providing bill payment assistance for those in immediate crisis and water use efficiency tools in

the hope of reducing future utility bills."**2**  Those who do not qualify for the WRAP may be eligible for DWSD's "10/30/50" plan, which allows customers to enter a payment plan by paying down ten percent of their past due balance—an improvement over the former plan requiring a thirty percent down payment.**3**

These efforts are commendable.  But they do not impact the continuing viability of plaintiffs' claims.  First, it appears none of the named plaintiffs are enrolled in the WRAP or the 10/30/50 payment plan; defendants do not contend that they are.  Smith and Lyda testified that they could not afford the requisite ten percent down payment, and Hill continues to struggle with her water bills notwithstanding these new options.  The existence of programs that could—but ultimately do not—help plaintiffs does not moot their claims.  Second, these programs relate only to one of several issues on appeal—plaintiffs' claim that they are entitled to continued water service at a price they can afford.  Even if we agreed this issue is moot (and we do not), "the case as a whole remains alive because other issues have not become moot."  *Int'l Union, United Auto., Aerospace, Agric. and Implement Workers of Am. v. Dana Corp.*, 697 F.2d 718, 721 (6th Cir. 1983) (citation omitted); *see e.g.*, *Ky. W. Va. Gas Co. v. Oil, Chem., and Atomic Workers Int'l Union*, 549 F.2d 407, 411–12 (6th Cir. 1977) (examining the issues presented "separately to determine whether or not they have become moot").  Finally, the timing of service interruptions cannot be ignored—DWSD reconnected Lyda's water service on the day she filed suit, and planned to terminate Smith's for the second time the day after the evidentiary hearing.  Coincidental or not, this is the type of conduct the capable-of-repetition exception is intended to preserve for review.  *See United States v. Oregon Med. Society*, 343 U.S. 326, 333 (1952) (warning courts to "beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption").

---

**2**The WRAP provides those with a household income at or below 150% of the federal poverty threshold up to $1,000 in assistance per year towards their water bills.  Enrolled customers who remain current on monthly bills are also eligible to have a portion of their past due balance forgiven.  If a participant's water usage is significantly higher than the regional average, DWSD may conduct a water audit to identify possible leaks or other ways to reduce consumption.

**3**If customers miss a payment, "they can reapply for the program by putting down 30 percent of their past-due balance.  A second missed payment will require a 50 percent down payment of their past-due amount.  Any customer who misses a third payment will no longer be eligible for the payment plan."

"[T]he chain of potential events does not have to be air-tight or even probable to support the court's finding of non-mootness. Instead, it is sufficient that [plaintiffs] *possibly* could" find themselves "once again in the same situation [they] faced when this suit was filed." *Barry*, 834 F.3d at 716. Plaintiffs have made at least that showing. Current restoration of service does not moot their claims.

B.

A second intervening event compels a different conclusion with regard to plaintiffs' procedural due process claim. Plaintiffs allege DWSD violated their due process rights by "[s]ystematically terminating water services without providing adequate notice of shutoffs," bills due, procedures to contest bills and shutoffs, or potential payment plans. Less than a month after plaintiffs filed their amended complaint, Detroit Mayor Mike Duggan announced changes to the procedures they disputed as part of DWSD's "Ten Point Plan."

"Legislative repeal or amendment of a challenged statute . . . usually eliminates th[e] requisite case-or-controversy because a statute must be analyzed by the appellate court in its present form." *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 822 (6th Cir. 2012) (quoting *Ky. Right to Life v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997)). But "[a] controversy does not cease to exist merely by virtue of a change in the applicable law"—or in this case, the applicable procedure, *Hamilton Cty. Educ. Ass'n v. Hamilton Cty. Bd. of Educ.*, 822 F.3d 831, 835 (6th Cir. 2016); "if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). The question instead is whether the new procedure is "sufficiently similar to the repealed [procedure] that it is permissible to say that the challenged conduct continues." *Id.* at 662 n.3. If the current procedure "operates in the same fundamental way" its predecessor did, the original controversy remains alive. *Green Party*, 700 F.3d at 823 (citation omitted). If, on the other hand, the procedure "has been sufficiently altered so as to present a substantially different controversy," the claim is moot. *Hamilton Cty.*, 822 F.3d at 835 (citation omitted).

This case involves the latter circumstance. Apart from finding plaintiffs' factual allegations insufficient, the bankruptcy court reasoned that the complaint incorporated DWSD's old bills and shutoff notices by reference, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "consider[ed] them in determining the adequacy of the plaintiffs' due process allegations." It concluded their "specific content" provided plaintiffs all the notice the Due Process Clause required. But the factual predicate for plaintiffs' notice claim—and the bankruptcy court's review of it—has changed.

DWSD's shutoff procedure is no longer limited to a bill, followed by a shutoff notice, followed by termination of service. Defendant now places door hangers on households seven days before a scheduled termination. The hangers serve as another layer of warning and include information about how to make payments, seek payment assistance, and avoid service interruption. The Ten Point Plan also changed the "specific content" of bills and notices. "Past Due" bills now include a provision for "COMPLAINTS AND DISPUTES," warning that it is the customer's responsibility to inform DWSD of a dispute within 28 days of the billing date. Water shutoff notices also explain customer rights not previously disclosed, such as the right to file a complaint; request and appear at a hearing; enter a payment plan; and delay shutoff in the event of a medical emergency.

In light of these changes, we cannot evaluate the bankruptcy court's review of DWSD's old bills and notices because we are bound to consider the procedure "in its present form." *Green Party*, 700 F.3d at 822 (citation omitted). Moreover, the procedural posture of this case also means we cannot consider the "specific content" of the new bills, door hangers, and shutoff notices because plaintiffs' appeal of a Rule 12(b)(6) dismissal limits us to the pleadings. And unlike the bankruptcy court, we cannot read the complaint to incorporate these extraneous documents by reference—DWSD did not conceive of, or use them until after the complaint was filed.

Regardless of whether the new procedure is adequate, our review confirms that it "has been sufficiently altered so as to present a substantially different controversy" than the one that

existed at the time of filing. *Hamilton Cty.*, 822 F.3d at 835 (citation omitted). Plaintiffs' procedural due process claim is therefore moot.[4]

A continuing controversy persists with regard to plaintiffs' remaining claims.[5] Having confirmed our jurisdiction over them, we proceed to the merits.

III.

"Whether a bankruptcy appeal comes before this court by way of the Bankruptcy Appellate Panel (BAP) or the district court, our review is of the bankruptcy court's decision." *Tidewater Fin. Co. v. Curry (In re Curry)*, 509 F.3d 735, 735 (6th Cir. 2007). We review the bankruptcy court's dismissal of the complaint for failure to state a claim and its interpretation of 11 U.S.C. § 904 de novo. *Se. Waffles, LLC v. U.S. Dep't of Treasury (In re Se. Waffles, LLC)*, 702 F.3d 850, 856 (6th Cir. 2012); *Deutsche Bank Nat. Trust Co. v. Tucker*, 621 F.3d 460, 462 (6th Cir. 2010).

"The pivotal issue in this case is one of statutory construction," *Deutsche Bank*, 621 F.3d at 462, namely, whether and to what extent plaintiffs' complaint survives 11 U.S.C. § 904. While the bankruptcy court determined that § 904 foreclosed recovery only on plaintiffs' state-law claims, defendants argued below that the provision's effect is broader, prohibiting the court from awarding any of the relief requested, whether plaintiffs alleged their injuries as state-law or constitutional harms. We agree.

---

[4]We previously applied the voluntary cessation exception to determine whether a change in water termination procedures moots a challenge to the earlier policy. *See Golden v. City of Columbus*, 404 F.3d 950, 962 n.10 (6th Cir. 2005). Plaintiffs do not ask us to scrutinize DWSD's conduct under this exception, though it does not change the outcome. Voluntary cessation of a disputed procedure negates mootness only when "legislators . . . publicly expressed an intention to re-enact the offending legislation," or in this case, the offending procedure. *Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 836 (6th Cir. 2004); *see also Bench Billboard v. City of Cincinnati*, 675 F.3d 974, 981–82 (6th Cir. 2012). DWSD has not expressed any such intent.

[5]The parties argue over the potential mootness of these claims as if the City's chapter 9 case were closed. It is not. The bankruptcy court confirmed the City's plan of adjustment, but it has not dismissed the action. *See In re City of Detroit*, No. 13-53846 (Bankr. E.D. Mich.). In its confirmation order, the court retained jurisdiction over adversary proceedings like plaintiffs' (among other matters), and these disputes remain pending. Further, the plan itself mentions water rates in only a few short lines, stating that the City "may seek to implement a rate stability program" at a future date. As the bankruptcy court found, this provision "does not bind the City to take any specific actions," nor does it prohibit defendants from acting in accordance with an order awarding injunctive or declaratory relief. In other words, nothing regarding the present status of the case makes it "impossible for the court to grant any effectual relief whatever" to plaintiffs if they prevail. *Fialka-Feldman*, 639 F.3d at 713.

A.

"The general policy considerations underlying the municipal debt adjustment plan of chapter 9 are the same as that of chapter 11 reorganization: to give the debtor a breathing spell from debt collection efforts and establish a repayment plan with creditors." *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994). "One dramatic difference" between the two is § 904, which limits the bankruptcy court's authority over the municipal debtor. *In re City of Stockton*, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013) (*Stockton II*). It provides:

> Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
>
> (1) any of the political or governmental powers of the debtor;
>
> (2) any of the property or revenues of the debtor; or
>
> (3) the debtor's use or enjoyment of any income-producing property.

11 U.S.C. § 904. "This section makes clear that the court may not interfere with the choices a municipality makes as to what services and benefits it will provide." *Addison*, 175 B.R. at 649. Were that not clear enough, a companion provision in § 903 reiterates that "[t]his chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality . . . in the exercise of the political or governmental powers of such municipality," with limited exception. 11 U.S.C. § 903.

Section 904 "is a keystone in the constitutional arch between federal bankruptcy power and state sovereignty." *Stockton II*, 486 B.R. at 198. Powers not delegated to the federal government in our Constitution are reserved to the states. U.S. Const. amend. X. One of those powers is the power to create and govern municipalities. *Addison*, 175 B.R. at 649. And "[t]he sovereignty of the state essential to its proper functioning under the Federal Constitution cannot be surrendered; it cannot be taken away by any form of legislation." *Ashton v. Cameron Cty. Water Improvement Dist. No. 1*, 298 U.S. 513, 531 (1936) (striking down § 904's earliest predecessor). Congress therefore drafted chapter 9 "to give courts only enough jurisdiction to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control." *Addison*, 175 B.R. at 649; *see also Ass'n of Retired Emps. of the City of*

*Stockton v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 17–18 (Bankr. E.D. Cal. 2012) (*Stockton I*) (detailing statutory history).

"The argument that the plain language of the statute should be applied is always strong." *In re City of Detroit*, 524 B.R. 147, 208 (Bankr. E.D. Mich. 2014). Application of § 904's plain language is straightforward:

> In the overall construct, § 904 performs the role of the clean-up hitter in baseball. Its preambular language "[n]otwithstanding any power of the court, . . . the court may not, by any stay, order, or decree, in the case or otherwise . . ." is so comprehensive that it can only mean that a federal court can use no tool in its toolkit—no inherent authority power, no implied equitable power, no Bankruptcy Code § 105 power, no writ, no stay, no order—to interfere with a municipality regarding political or governmental powers, property or revenues, or use or enjoyment of income-producing property. *As a practical matter, the § 904 restriction functions as an anti-injunction statute—and more*.

*Stockton I*, 478 B.R. at 20 (citations omitted, emphasis added).

The relief plaintiffs seek is exclusively injunctive and declaratory: preliminary and permanent injunctions ending water shutoffs and restoring service; declarations that DWSD's billing and shutoff procedures are illegal in multiple respects; and an order requiring DWSD to "implement a water affordability plan with income based payments for DWSD residential customers." Section 904's plain language expressly prohibits the bankruptcy court from awarding any of these remedies.

Preliminary or permanent injunctions directing DWSD to stop terminations or to provide water service—including service at a specific price—necessarily "interfere[s] with" the city's "governmental powers," its "property [and] revenues," as well as its "use [and] enjoyment of . . . income-producing property." *See* 11 U.S.C. § 904. A declaration that DWSD's practices are illegal or unconstitutional does the same. Section 904 strips the bankruptcy court of authority to order anything of the sort. *See Stockton I*, 478 B.R. at 21 (regarding the plaintiffs' request for monetary relief and attorney's fees).

Plaintiffs address the text of § 904 only in their reply. They concede that the provision limits the bankruptcy court's authority "as to the property of the [C]ity," and do not explain how

the court can grant declaratory or injunctive relief without offending these limitations.  The party seeking to overcome the plain language of the Bankruptcy Code "bears an 'exceptionally heavy' burden."  *Patterson v. Shumate*, 504 U.S. 753, 760 (1992) (quoting *Union Bank v. Wolas*, 502 U.S. 151, 155–56 (1991)).  Plaintiffs do not carry theirs.

B.

Although plaintiffs sought the same declaratory and injunctive relief for their state-law and constitutional claims, the bankruptcy court interpreted § 904 as barring recovery only on the former, and not the latter:  "The Court concludes that § 904 does not protect the City from the bankruptcy court's jurisdiction over plaintiffs' constitutional claims because the City does not have the 'governmental power' to violate the due process and equal protection mandates of the Constitution."  Citing *Monell*, it further explained "[t]he Tenth Amendment's reservation of nondelegated powers . . . is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment." (citation omitted).  "The City must comply with those constitutional mandates."  This reasoning is not persuasive.

Municipal governments indisputably do not have "governmental power" to violate citizens' constitutional rights.  But it does not follow that the bankruptcy court has judicial power to enjoin such violations.  Section 904 says it does not.  "[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms"—*all* of its terms.  *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (internal quotation marks omitted); *see also TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[N]o clause, sentence, or word" of a statute should be read as "superfluous, void, or insignificant.") (citation omitted).  Relying solely on § 904(1), the bankruptcy court did not address the statute's prohibitions against interference with the "property or revenues of the debtor," or "use or enjoyment of any income-producing property"—both of which would be transgressed if the court awarded the declaratory and injunctive relief plaintiffs requested.  *See* 11 U.S.C. § 904(2)–(3).

That a federal court's power should be more constrained in the chapter 9 context than in a typical *Monell* action also makes sense.  *Monell* plaintiffs may claim damages, *see generally*,

*Carey v. Piphus*, 435 U.S. 247 (1978), and prospective injunctive relief, such as the implementation of a training program that better protects citizens' constitutional rights, provided they make the appropriate showing, *see, e.g.*, *Hearring v. Sliwowski*, 806 F.3d 864, 867–68 (6th Cir. 2015). We agree that the Tenth Amendment is not a barrier to a federal court's authority over a municipality in that setting. *Monell*, 436 U.S. at 690 n.54.

But a discrete change in policy in a particular office or department of local government is far removed from the complete financial overhaul undertaken in a municipal reorganization. Detroit's case is a good example. "At the time of filing, the City had over $18 billion in escalating debt, over 100,000 creditors, hundreds of millions of dollars of negative cash flow," failing infrastructure, and "a crumbling water and sewer system." *In re City of Detroit*, ___ F.3d ___, Nos. 15-2194/2337/2353/2371/2379, 2016 WL 5682704, *1 (6th Cir. Oct. 3, 2016). The bankruptcy court bore responsibility for approving a plan of adjustment equally vast in its aim to remedy these conditions. *See id.* at *2. Concerns for state sovereignty loom larger with so much at stake. "As a state-federal cooperative enterprise conducted in delicate circumstances in which state sovereignty must be respected, Congress has been sedulous to assure that the bankruptcy power not be used in municipal insolvencies in a manner that oversteps delicate state-federal boundaries." *Stockton I*, 478 B.R. at 20. The massive scale of a municipal bankruptcy simply provides more opportunities for excessive federal court interference.

Hence, in addition to §§ 903 and 904, "[t]he entire structure of chapter 9 has been influenced by [a] pervasive concern to preserve the niceties of the state-federal relationship." *Id.* Unlike in a chapter 11 case for instance, a chapter 9 petition creates no bankruptcy estate, and the Code's restrictions on use, sale, or lease of property do not apply. *See* 11 U.S.C. § 901(a) (excluding the application of 11 U.S.C. § 363); *see also* Melissa B. Jacoby, *Federalism Form and Function in the Detroit Bankruptcy*, 33 Yale J. on Reg. 55, 61 (2016) (describing the unique features of a municipal reorganization). There is no provision for the appointment of a trustee or examiner, *see* 11 U.S.C. § 901(a) (excluding application of 11 U.S.C. § 1104), nor is there any provision for involuntary bankruptcy; the city alone files its chapter 9 petition with the consent of the state, 11 U.S.C. § 109(c)(2). And the city alone files and amends its plan of adjustment. 11 U.S.C. §§ 941 & 942. "Neither the court nor creditors can directly force a liquidation of a

municipality's assets in bankruptcy." Jacoby, *supra* at 61.  Reading § 904 to preclude recovery on common-law and constitutional claims alike complements this structure.

In rebuttal, plaintiffs argue that their constitutional claims supersede § 904 because Congress cannot circumvent rights guaranteed to citizens through the Fourteenth Amendment. But § 904 does not limit rights—it limits remedies.  The bankruptcy court later determined that creditors asserting constitutional challenges against the City through 42 U.S.C. § 1983 may have their claim to damages impaired and discharged in bankruptcy like any other unsecured creditor: "The § 1983 remedial scheme may 'emanate' or 'flow from' the Fourteenth Amendment, as the § 1983 creditors argue.  This does not, however, elevate that remedy to a constitutionally protected status." *In re City of Detroit*, 524 B.R. 262–65; *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) (noting that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights" found elsewhere in the constitution and federal statutes).  Its conclusion is bolstered by the fact that chapter 9 does not incorporate 11 U.S.C. § 523, which prohibits "individual debtor[s]" from discharging debts arising from "willful or malicious injury by the debtor to another"—reinforcing notion that such debts are dischargeable for a municipality.  *See* 11 U.S.C. §§ 523(a)(6) (exempting debts for "willful and malicious injury" from discharge); 901(a) (excluding application of 11 U.S.C. § 523); *see also Deocampo v. Potts*, 836 F.3d 1134, 1140 n.10 (9th Cir. 2016).  Plaintiffs' constitutional rights are inviolable; but the remedies available to them in the chapter 9 setting are not.[6]

"A statute's plain meaning must be enforced, of course." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993).  Section 904's mandate is clear:  it prohibits federal courts overseeing a municipal bankruptcy from interfering with the debtor's political or governmental powers, property or revenues, or use or enjoyment of income-producing property, regardless of whether the claims at issue are constitutional.  11 U.S.C. § 904.  Because § 904 prohibits the bankruptcy court from awarding the relief sought, notwithstanding the

---

[6]Although an adversary proceeding is normally an appropriate vehicle to obtain injunctive and declaratory relief, *see* Fed. R. Bankr. P. 7001(7) & (9), in view of the City's § 904 defense, plaintiffs may have been better off moving for relief from the automatic stay to pursue their claims outside of bankruptcy court.  *See* 11 U.S.C. § 362; *see also id.* § 901(a) (incorporating § 362).  Plaintiffs would have to prove that they are a "party in interest," entitled to lift the stay "for cause," despite their status as non-creditors.  11 U.S.C. § 362(d)(1); *see also Addison*, 175 B.R. at 649–50; *In re City of San Bernardino*, 558 B.R. 321, 328–33 (Bankr. C.D. Cal. 2016).

constitutional dimension of their injuries, plaintiffs failed to state a claim upon which relief can be granted.  *See Hamdi ex rel. Hamdi v. Napolitano*, 620 F.3d 615, 628–29 (6th Cir. 2010). We therefore affirm the dismissal of plaintiffs' amended complaint on these alternative grounds.

IV.

As explained, "Congress has tailored the federal municipal bankruptcy laws to preserve the States' reserved powers over their municipalities." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1944 (2016).  Plaintiffs cannot upset that carefully tailored balance and expand the bankruptcy court's authority over the City based on the manner in which they draft their complaint.  But even if they could, their constitutional claims fare no better under well-settled precedent.

After concluding plaintiffs' substantive due process and equal protection claims survived the City's § 904 challenge, the bankruptcy court dismissed both causes of action for failure to state a claim upon which relief can be granted.  *See* Fed. R. Bankr. P. 7012 (incorporating Fed. R. Civ. P. 12).  Plaintiffs argue this decision was in error.  We disagree.

We review the dismissal of a complaint for failure to state a claim de novo.  *Se. Texas Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 671 (6th Cir. 2006).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 557).  "If the plaintiffs do not nudge their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (citation and brackets omitted).  Dismissal is likewise appropriate where the complaint, however factually detailed, fails to state a claim as a matter of law.  *Mitchell v. McNeil*, 487 F.3d 374, 379 (6th Cir. 2007).

A.

The bankruptcy court read plaintiffs' complaint to include a claim for a substantive due process "right to water service at a price they can afford to pay."[7] It concluded "that there is no constitutional or fundamental right either to affordable water service or to an affordable payment plan for account arrearages."

"Substantive due process is 'the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (brackets omitted)). The class of interests it protects is "narrower than those protected by procedural due process." *Id.* at 588 n.6. Government conduct violates substantive due process rights only if it deprives an individual of a particular constitutional guarantee, or otherwise "shock[s] the conscience." *Id.* at 588 (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003)). Withholding water on condition of payment for delinquent charges does neither. *See Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1476–78 (6th Cir. 1993).

"Based on the City's legal obligation to provide municipal water service to its residents," the bankruptcy court found it "plausible that the plaintiffs could establish a liberty or property right to water service to which procedural due process rights apply." However, "not all property interests that create procedural due process protections necessarily create substantive due process rights." *Id.* at 1477. A municipality's provision of utility service may create a property interest "cognizable under the Due Process Clause," bringing that service "within the compass of the Fourteenth Amendment's procedural protections, measured according to . . . *Matthews v. Eldridge*." *Id.* (quoting *Ransom v. Marrazzo*, 848 F.2d 398, 411–12 (3d Cir. 1988)). But "it does not transform the expectation into a substantive guarantee against the state in any circumstance." *Id.* (quoting *Ransom*, 848 F.2d at 412).

"Substantive due process affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental." *EJS Props., LLC v. City of Toledo*,

---

[7] Both parties agree with this interpretation.

698 F.3d 845, 862 (6th Cir. 2012) (quoting *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990)).  These rights are "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksburg*, 521 U.S. 702, 721 (1997) (internal quotation marks omitted).  Thus, "the list of fundamental rights is short," *Grinter v. Knight*, 532 F.3d 567, 573 (6th Cir. 2008), and seldom expanded, *see Washington*, 521 U.S. at 720.  Rights derived from state law, as opposed to the constitution, usually do not make the cut.  *Charles*, 910 F.2d at 1353.  "Most state-created rights that qualify for procedural due process protections do not rise to the level of substantive due process protection."  *Range*, 763 F.3d at 588 n.6.

This is the case for plaintiffs' alleged property right to continued water service—or continued *affordable* water service.  A right of this nature is not rooted in our nation's traditions or implicit in the concept of ordered liberty.  *See Mansfield*, 988 F.2d at 1477; *Golden*, 404 F.3d at 960.  If such a right exists, it is rooted in Michigan law and the customer relationship plaintiffs share with DWSD.  *Memphis Light*, 436 U.S. at 10–11; *see also Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 763–64 (6th Cir. 2005); Mich. Comp. Laws § 123.166.  Accordingly, we previously "reject[ed] the claim that conditioning the receipt of water service on the satisfaction of past due charges . . . raises the question of a substantive due process violation." *Mansfield*, 988 F.2d at 1477.  We reject it again today:  "there is no fundamental right to water service."  *Golden*, 404 F.3d at 960.

Moreover, substantive due process requires only that DWSD's policy be "rationally related to the asserted legitimate governmental purpose of maintaining a financially stable municipal entity."  *Mansfield*, 988 F.2d at 1477; *see also Midkiff*, 409 F.3d at 769–70.  Michigan law directs municipalities to set water rates at the reasonable cost of providing the service. *See* Mich. Comp. Laws § 141.121(1).  As the bankruptcy court found, this practice is rationally related to maintaining DWSD's financial stability:

> Nothing suggests that it is arbitrary for the State of Michigan to require its municipalities to set water rates at the reasonable cost of delivering the service. Rather, the substantial costs involved [in] making water service available to customers suggests that it is entirely rational to fix the rates according to those costs rather than ability to pay.  In a rate structure based on ability to pay, every dollar that a customer would not pay because of an inability to pay is one more

dollar that other customers, or taxpayers, would have to pay.  It is not irrational for the state to determine not to permit its municipalities to adopt such an alternative rate structure.

The bankruptcy court expressed empathy for plaintiffs' circumstances.  We echo its concern.  The "inability . . . to pay for water service on a current basis or to make up large arrearages due to past inability to pay is a serious, tragic problem facing the City and some residents."  But the court correctly declined to "conclude that the plaintiffs' due process rights were violated when their water service was terminated for failing to pay, even when that failure was due to an inability to pay."  It did not err in dismissing plaintiffs' claim for affordable water service.

B.

In Count III, plaintiffs alleged DWSD violated their equal protection rights by terminating their water service, while neglecting to do the same for delinquent commercial customers.  The bankruptcy court dismissed their claim as insufficiently pled.

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted).  Because no fundamental right or suspect class is involved in this case, plaintiffs bear the burden of establishing DWSD's policy "is not rationally related to any legitimate public interest." *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015).

This is an uphill climb.  Under the rational basis standard, government action is afforded a strong presumption of validity, and we will uphold it as long as "there is a rational relationship between the disparity of treatment and some legitimate government purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993).  "A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id.*  The policy is presumed constitutional, and the burden is on plaintiffs to negate "every conceivable basis which might support it." *Id.* at 320 (citation omitted).  Such deference is based on "a paradigm of judicial restraint." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty.*, 430 F.3d 783, 791 (6th Cir. 2005) (citation omitted).  The

judiciary does not "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Heller*, 509 U.S. at 319 (citation omitted). Our "Constitution presumes that . . . improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *TriHealth*, 430 F.3d at 791 (citation omitted).

Plaintiffs assert that *Heller*'s standard of presumed rationality is inapplicable in the Rule 12(b)(6) context. In their view, requiring an equal protection claimant to "incorporate into their pleadings lengthy lists of rebuttable rationales for challenged legislation" is "an impossible" task at odds with *Twombly*'s holding that a complaint need only include enough facts to "raise a right to relief above the speculative level." (Appellants' Br., at 27 (quoting *Twombly*, 550 U.S. at 555)). Plaintiffs are mistaken.

*Heller* applies at the pleadings stage. *Midkiff*, 409 F.3d at 770. "To survive a motion to dismiss" in the rational basis context, "a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992).

We put this principle to work in *Bower v. Village of Mount Sterling*, 44 F. App'x 670 (6th Cir. 2002). The plaintiff in *Bower* alleged the defendants violated his equal protection rights by denying him "the opportunity to become a full-time police officer in the same manner as other Village officers." *Id.* at 672. He overcame "the presumption of rationality" in the defendants' decision by alleging facts that negated the two most likely non-discriminatory reasons defendants declined to hire him: a prior sexual harassment complaint, and the mayor's statement to Bower's supervisor that the Village council could not appoint him to a full-time position because appointing officers was not a council function. *Id.* at 675–76, 678. Specifically, the plaintiff alleged defendants appointed him as a reserve and part-time officer after the sexual harassment complaint (suggesting this was not their true motivation in denying him a full-time position). He also claimed the mayor's statement was contrary to Ohio law, as well as the council's past practice: "Plaintiff alleges that at least two other officers were hired in the exact same fashion

[that the mayor] represented was not a council function." *Id.* at 675, 678. The *Bower* court agreed that these facts adequately state an equal protection violation. *Id.* at 678.

Comparatively, plaintiffs here allege that: (1) "[a]t the time . . . of the residential water shutoffs," "there were numerous commercial water service consumers that were acknowledged to be delinquent in their payments"; (2) DWSD did not terminate water service to commercial customers "until there was international condemnation of the selective termination of water services"; and (3) there is no rational basis for the difference in treatment, as both residential and commercial customers "receive the same type of services." The amended complaint includes no facts rebutting the likely non-discriminatory reasons DWSD may treat residential and commercial customers differently. And there are many. As the district court stated:

> [T]he difference in treatment might be justified by the fact that commercial water customers have more complex service connections. . . . [It] might also be justified by the fact that terminating water service to commercial customers could seriously harm their businesses, causing layoffs and other undesirable economic consequences. The City might also reasonably find that commercial customers are more likely than residential customers to eventually pay past-due water bills.

Absent facts sufficient to overcome any of these explanations, plaintiffs' assertion that there is no rational basis for the difference in treatment is a legal conclusion not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678. The bankruptcy court therefore correctly dismissed plaintiffs' equal protection claim.

V.

Finally, plaintiffs contend the district court abused its discretion in denying them leave to file a second amended complaint correcting the deficiencies in their constitutional claims.[8]

But plaintiffs never moved for leave to amend. After the bankruptcy court granted defendants' motion to dismiss, plaintiffs filed four motions for reconsideration and included the same single-sentence request for leave to amend in each one. They did not offer a proposed second amended complaint or otherwise "state with particularity the grounds" for the relief sought. Fed. R. Bankr. P. 9013 (incorporating Fed. R. Civ. P. 7(b)(1)). The bankruptcy court

---

[8]Insofar as this challenge relates to plaintiffs' procedural due process claim, their request to amend the complaint is moot for the reasons stated in section II.B.

was not obligated to grant so perfunctory a request buried in motions directed at a different purpose. *See Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 853 (6th Cir. 2006). In any event, plaintiffs offered no set of factual allegations entitling them to relief in view of § 904. We find no abuse of discretion in the bankruptcy court's decision. *Id.* at 853–54.

VI.

The foregoing conclusions moot plaintiffs' appeal of the bankruptcy court's decision denying their request for a TRO. Plaintiffs are not entitled to any relief, much less preliminary relief.

VII.

The circumstances plaintiffs allege are truly unfortunate. Living without water, even if only for a few days, poses a substantial risk to health and safety. Beyond that, it is a significant indignity. But plaintiffs have not identified a legal theory capable of evading § 904's broad prohibitions against injunctive and declaratory relief. Nor have they alleged facts sufficient to state claims for the violation of substantive due process or equal protection rights.

For these reasons, we VACATE the district court's order with respect plaintiffs' now-moot procedural due process claim, and AFFIRM its order affirming dismissal of plaintiffs' remaining claims.