RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0193p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CHARLES M. ANDREWS, SR., Trustee of the Gloria M.
Andrews Trust Dated April 23, 1998,

       *Plaintiff-Appellant,*

    *v.*

CITY OF MENTOR, OHIO,

       *Defendant-Appellee.*

No. 20-4030

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:20-cv-00058—Pamela A. Barker, District Judge.

Decided and Filed:  August 25, 2021

Before:  BOGGS, MOORE, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:**  J. David Breemer, PACIFIC LEGAL FOUNDATION, Sacramento, California,
Kenneth J. Fisher, KENNETH J. FISHER CO., L.P.A., Cleveland, Ohio, for Appellant.  Steven
D. Strang, Nicholas G. Anhold, GALLAGHER SHARP LLP, Cleveland, Ohio, for Appellee.

    MOORE, J., delivered the opinion of the court in which BOGGS, J., joined, and
LARSEN, J., joined in part.  LARSEN, J. (pp. 20–26), delivered a separate opinion concurring in
part and dissenting in part.

─────────────────

## OPINION

─────────────────

    KAREN NELSON MOORE, Circuit Judge.  Charles Andrews, Sr., Trustee of the Gloria
M. Andrews Trust Dated April 23, 1998 ("the Trust"), appeals from a final judgment entered

against the Trust by the district court after it granted the City of Mentor, Ohio's ("the City")
motion for judgment on the pleadings. The Trust takes issue specifically with the district court's
resolution of the Trust's claims arising under the Takings Clause and Equal Protection Clause,
both of which stem from the City's denial of the Trust's application for rezoning of
approximately sixteen acres of real property. For the reasons that follow, we **REVERSE** the
judgment of the district court and **REMAND** for further proceedings.

## I. BACKGROUND

For over fifty years, the Andrews family has owned "three (3) contiguous parcels of real
property located at 8180 and 8188 Garfield Road, Mentor, Ohio consisting of approximately
16.15[] acres." R. 1 (Compl. at ¶ 16–17) (Page ID #5). The property—currently held by the
Trust—sits near the western terminus of Norton Parkway, a road completed in 2006
that connects Garfield Road to Center Street. *Id.* at ¶ 21 (Page ID #6); R. 1-9 (Map) (Page
ID #68). Center Street, in turn, connects to Interstate 90 via an interchange completed in 2005.
R. 1 (Compl. at ¶ 19) (Page ID #5). According to the Trust, the completion of Norton Parkway
and the Center Street interchange "has dramatically changed the character of the area from a
rural residential setting to a mixed-use area that includes industrial, office, commercial, medical,
senior living and a variety of residential types and uses." *Id.* at ¶ 23 (Page ID #7). Sensing
opportunity, the Trust has explored developing its property for residential use.

This dispute arises from the Trust's failed attempt to have its 16.15 acres rezoned under
Mentor's Code of Ordinances from "Single Family R-4" to "Village Green – RVG." Whereas
the R-4 zone allows for low-density single-family residences with a lot size of at least one-half
acre, the RVG zone allows for higher-density development of three-to-five residential units per
acre with fifteen percent of the total acreage designated for open space. *Id.* at ¶¶ 11, 18 (Page ID
#3, 5); R. 1-7 (Comprehensive Plan at 65–69) (Page ID #60–65). Rezoning the Trust's property
to RVG would allow the Trust to develop forty single-family residences on its property with
about five acres left as designated open space. R. 1 (Compl. at ¶ 28) (Page ID #7–8). Without
the rezoning, and subject to ordinances limiting the length of cul-de-sacs to 600 feet, the Trust
could develop only thirteen single-family residences on seven acres, allegedly leaving the
remaining nine acres undevelopable. *Id.* at ¶ 40 (Page ID #10–11). The difference is significant

for the Trust, which expects sales of approximately $4,000,000 if the property is rezoned to RVG, compared to sales of $1,560,000—at a loss to the Trust—if the land remains within the R-4 zone. *Id.* at ¶¶ 33, 41 (Page ID #8, 11).

The Trust submitted its application for rezoning on August 2, 2019, seeking rezoning of its property from R-4 to RVG and approval of a forty-unit RVG subdivision that the Trust refers to as the Echo Hill Manor Subdivision. *Id.* at ¶ 28 (Page ID #7–8). According to the Trust, its Echo Hill Manor Subdivision plan is materially identical to a plan that the City approved for rezoning and development in 2017, known as the "Woodlands of Mentor." *Id.* at ¶ 30 (Page ID #8). Nevertheless, the City Planning Commission unanimously recommended denial of the Trust's application for rezoning, and City Council adopted that recommendation by a four-to-three vote on November 6, 2019. *Id.* at ¶¶ 38–39 (Page ID #10). According to the Trust, this is the first time that the City has denied an application for rezoning to RVG since 2004, and the City has approved nine comparable applications in the time since (with three applications pending) consistent with its express preference for RVG zoning as reflected in the City's 2011 Comprehensive Plan. *Id.* at ¶¶ 11, 14–15 (Page ID #3–5).

Having been rebuffed by the City, the Trust turned to the courts, filing a complaint against the City on January 10, 2020. Broadly alleging violations of the Fifth and Fourteenth Amendments without precisely identifying the constitutional theories supporting its claims, the Trust sought declaratory relief and compensatory and punitive damages. *Id.* at 15–16 (Page ID #15–16). After answering the Trust's complaint, the City moved for judgment on the pleadings, arguing that the Trust's lack of a property interest in its land as rezoned RVG was fatal to all of its claims, whatever theories those claims might be based upon. R. 12 (Answer) (Page ID #107); R. 13 (Mot. J. Pleadings at 1) (Page ID #113). The Trust opposed the motion, clarifying that it was alleging violations of the Takings Clause, the Equal Protection Clause (on theories of fundamental rights and "class of one"), and the Due Process Clause (substantive due process). R. 14 (Opp. at 8–15) (Page ID #136–43). In its reply, the City reiterated its argument that the Trust lacks a property interest in its land as rezoned RVG and argued that the Trust failed to allege facts sufficient to state a class-of-one equal-protection claim. R. 16 (Reply at 3–9) (Page ID #149–55).

On September 10, 2020, the district court granted the City's motion for judgment on the pleadings. Beginning with the Trust's substantive-due-process claim, the district court held that the Trust had failed to state a claim, reasoning that the Trust lacked a property interest in its land as rezoned RVG because rezoning is a "discretionary benefit." *Andrews v. City of Mentor*, No. 1:20-CV-00058, 2020 WL 5423964, at *5–6 (N.D. Ohio Sept. 10, 2020) (quoting *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 857 (6th Cir. 2012)). The district court applied the same reasoning to dismiss the Trust's takings claim for lack of a cognizable property interest. *Id.* at *7–8. Turning to the Trust's equal-protection claim, the district court held that the Trust failed to state a claim because it failed to establish (1) that the City's denial of its rezoning application burdened a fundamental right and (2) a viable class-of-one claim because the Trust failed "to negate potential explanations for the City's decision" to deny the Trust's application for rezoning while granting a similar request associated with the Woodlands of Mentor development. *Id.* at *13. However, the district court granted the Trust leave to amend its complaint to allege facts negating potential explanations for the City's differential treatment of the Echo Hill Manor Subdivision and Woodlands of Mentor properties. *Id.*

Instead of amending its complaint, the Trust elected to stand upon its allegations and moved for issuance of a final judgment and appealable order. R. 19 (Mot. for Final J. at 1–2) (Page ID #187–88). The district court obliged the Trust's request and entered judgment in favor of the City on all claims. R. 20 (J. at 1–2) (Page ID #190–91). This timely appeal followed, *see* R. 21 (Not. of App.) (Page ID #192), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

"We review de novo a grant of judgment on the pleadings," *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020), applying the same standard that we would for a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), *Hindel v. Husted*, 875 F.3d 344, 346 (6th Cir. 2017). Construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true, we ask whether the complaint contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III. DISCUSSION

The Trust raises two arguments on appeal. First, it argues that the district court erred in granting the City's motion for judgment on the pleadings as to the Trust's takings claim because the Trust's ownership of the sixteen acres is a sufficient property interest to support its takings claim. Second, the Trust argues that it does not need to plead facts negating every possible explanation for the City's differential treatment between the Trust's property and the Woodlands of Mentor for its class-of-one equal-protection claim to survive a motion for judgment on the pleadings. Taking the Trust's arguments in turn, we conclude that both have merit.

### A. Takings Claim

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017); *see also Dolan v. City of Tigard*, 512 U.S. 374, 383 (1994) (Takings Clause applies to the States via the Fourteenth Amendment). Takings claims come in a few shapes and sizes. First, there is the quintessential takings claim based on "direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). "[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Id.* at 538. Second, there are so-called "regulatory takings," which concern land-use regulations. *Id.* A "total regulatory taking" occurs where a land-use regulation "deprives [the] land of all economically beneficial use," leaving the land "economically idle." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019, 1026–27 (1992). But even where a regulation allows for some economically beneficial use of the property in question, "a taking still may be found based on 'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). These factors were articulated most famously in *Penn Central Transportation Co. v. City of New York* ("*Penn Central*"), 438 U.S. 104, 124 (1978).

The Trust asserts both kinds of regulatory-takings claims, arguing that the City's R-4 zoning of the Trust's sixteen acres "deprives [the] land of all economically beneficial use" and, alternatively, that the City's R-4 zoning of the Trust's property amounts to a taking under the multi-factor *Penn Central* test.  Appellant Br. at 12.  But the district court, at the City's behest, dismissed the Trust's takings claim at the threshold, holding that the Trust's claim fails because the Trust lacks a property interest in the land "as rezoned to RVG."  *Andrews*, 2020 WL 5423964, at *8.  To reach its conclusion, the district court drew upon our zoning caselaw in the substantive-due-process context, which provides that a "party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary."  *Id.* at *5, *7–8 (quoting *Med Corp. v. City of Lima,* 296 F.3d 404, 409 (6th Cir. 2002)).  Reasoning that Ohio law and the City's ordinances gave the City the discretion to grant or deny the Trust's application for rezoning, the district court concluded that the Trust lacked a property interest in its land as rezoned RVG and held that the Trust had failed to plead a viable takings claim.  *Id.*  The Trust argues that the district court erred by applying the "discretionary benefit" theory of property from our substantive-due-process caselaw and that its ownership of the subject land is the only property interest needed to support its takings claim.  Appellant Br. at 13.  We agree with the first of those arguments and defer on the second.

The district court's reasoning began from a valid premise:  no takings claim can proceed without a valid property interest.  *See Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001) ("[T]he existence of a valid property interest is necessary in all takings claims.").  But the district court failed to cite a single case where a court utilized the "discretionary benefit" theory from the substantive-due-process context to determine whether a takings plaintiff held the requisite property interest to support their claim.  The City does no better on appeal, citing exclusively to cases in the due-process context without any explanation for why we should import that caselaw wholesale into the takings context.  *See* Appellee Br. at 10–14.  In contrast, the Trust has offered persuasive arguments for why we cannot rely on the "discretionary benefit" theory of property rights here, and cites opinions suggesting that the property rights protected by takings law are broader (or at least not coextensive with) the property rights protected by due process.  *See, e.g.*, *Lingle*, 544 U.S. at 540; *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 132 (2d Cir. 1998).

As the Trust points out, courts routinely consider takings claims like the Trust's that arise from a local authority's denial of rezoning, variances, or land-use permits. For example, *Penn Central* itself arose from New York City's Landmarks Preservation Commission's denial of an application seeking to build an office tower atop Grand Central Terminal. *See* 438 U.S. at 115–19. And in *Loreto Development Co. v. Village of Chardon*, we considered a takings claim arising from a municipality's discretionary denial of the plaintiff's application for rezoning of his property to allow for construction of a WalMart store. 149 F.3d 1183, 1998 WL 320981, at *4 (6th Cir. 1998) (table op.). We considered the merits of the takings claim despite finding that the plaintiff's due-process claim failed for want of a protected property interest due to the discretionary nature of the municipality's denial of rezoning. *See id.* at *3–4. Indeed, a plaintiff's *failure* to seek discretionary allowance for an otherwise proscribed use of their property—say, through a permit or application for a variance—will often doom their takings claim as unripe. *See, e.g.*, *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193–94 (1985), *overruled on other grounds by Knick v. Township of Scott*, 139 S. Ct. 2162 (2019); *see also Palazzolo*, 533 U.S. at 620–21 ("Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law."); *Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226, 2230 (2021). Thus, it cannot be, as the district court held, that the discretionary nature of City's denial of the Trust's application for rezoning of its property to RVG deprives the Trust of a cognizable property interest to challenge the current R-4 zoning of its property for takings purposes.

The question remains, however: if we cannot rely on due-process caselaw, how should we determine whether the Trust has a property interest that supports its takings claim? The Trust argues that its ownership of the land is sufficient to satisfy the requirement. And it is correct that an ownership interest in real property burdened by a land-use regulation is quintessentially a basis for a takings claim. *See, e.g.*, *Penn Central*, 438 U.S. at 115; *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 482 (6th Cir. 2004). But two Supreme Court cases suggest that the inquiry is slightly more complicated than the Trust lets on.

The first case is *Lucas*, where the Supreme Court recognized total regulatory takings as a class of per se takings under the Fifth Amendment. 505 U.S. at 1028. In holding that land-use regulations that deprive a piece of real property of "all economically beneficial use" categorically qualify as takings, the Court acknowledged a limited exception for circumstances where "the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Id.* at 1027. In other words, the titleholder cannot complain that the State has taken a use interest that was not a part of the owner's title to begin with. *See id.* Whether a given interest was part of the title to begin with, the Court explained, turned upon an analysis of what the "background principles of the State's law of property and nuisance already place on land ownership." *Id.* at 1029. In short, a law depriving a property of all economically beneficial use requires just compensation unless it merely duplicates the limits that "could have been achieved in the courts—by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." *Id.* The Court offered two examples to explain its approach:

> On this analysis, the owner of a lake-bed . . . would not be entitled to compensation when he is denied the requisite permit to engage in a landfilling operation that would have the effect of flooding others' land. Nor the corporate owner of a nuclear generating plant, when it is directed to remove all improvements from its land upon discovery that the plant sits astride an earthquake fault.

*Id.* In either case, the newly proscribed uses—flooding the lakebed or operating a nuclear plant on a fault line—were "*always* unlawful, and (subject to other constitutional limitations) it was open to the State at any point to make the implication of those background principles of nuisance and property law explicit." *Id.* at 1030.

The Court's reasoning in *Lucas* invoked the classic theory of property as a "bundle of rights" acquired when a new owner takes title to property. *Id.* at 1027. Under the "bundle of rights" approach, property is made up of a myriad of rights, including "the rights to possess, to use, to exclude, to profit, and to dispose." *Brotherton v. Cleveland*, 923 F.2d 477, 481 (6th Cir. 1991). In *Lucas*, the Court recognized that certain use rights are not part of the bundle acquired

when title is taken—as determined by background principles of state property and nuisance law. 505 U.S. at 1029–30.  The Court explained that

> [i]n light of our traditional resort to "existing rules or understandings that stem from an independent source such as state law" to define the range of interests that qualify for protection as "property" under the Fifth and Fourteenth Amendments, this recognition that the Takings Clause does not require compensation when an owner is barred from putting land to a use that is proscribed by those "existing rules or understandings" is surely unexceptional.

*Id.* at 1030 (citations omitted).  But where "a regulation that declares 'off-limits' all economically productive or beneficial uses of land goes beyond what the relevant background principles would dictate, compensation must be paid to sustain it."  *Id.*  In so concluding, the Court rejected the notion that "title is somehow held subject to the 'implied limitation' that the State may subsequently eliminate all economically valuable use," which would justify any newly enacted land-use regulation as the exercise of a preexisting limitation on the title-holder's use rights. *Id.* at 1028.

After crafting this approach to total regulatory takings, the Court declined to apply it to the South Carolina law at issue, deciding instead to remand the case for consideration in the first instance of whether the law duplicated what could have been achieved under state property and nuisance law.  *Id.* at 1031.  In doing so, however, the Court expressed its skepticism that the law—which prohibited *all* development on certain beachfront property—would pass the inquiry: "It seems unlikely that common-law principles would have prevented the erection of any habitable or productive improvements on petitioner's land; they rarely support prohibition of the 'essential use' of land." *Id.* (quoting *Curtin v. Benson*, 222 U.S. 78, 86 (1911)).  And the Court cautioned that "to win its case South Carolina must do more than proffer the legislature's declaration that the uses [the petitioner] desire[d] are inconsistent with the public interest, or the conclusory assertion that they violate a common-law maxim such as *sic utere tuo ut alienum non laedas.*"  *Id.*  "Instead, as it would be required to do if it sought to restrain [the petitioner] in a common-law action for public nuisance, South Carolina must identify background principles of nuisance and property law that prohibit the uses he now intends in the circumstances in which the property is presently found." *Id.*

The Court built upon the above analysis in *Palazzolo*. There, the petitioner owned a piece of waterfront property in Rhode Island, which he hoped to develop for use as a private beach club. 533 U.S. at 611, 614. Because the petitioner's plans included filling a salt marsh on the property, development could not proceed without a "special exemption" from state regulations protecting Rhode Island's coastal wetlands. *Id.* at 614–15. These regulations were in effect at the time that the petitioner took title to the property in 1978. *Id.* at 614. When the State denied the petitioner's application for a special exemption, he "filed an inverse condemnation action in Rhode Island Superior Court, asserting that the State's wetlands regulations, as applied by the Council to his parcel, had taken the property without compensation in violation of the Fifth and Fourteenth Amendments." *Id.* at 615. The petitioner claimed both a total regulatory taking under *Lucas* and a regulatory taking under the multi-factor *Penn Central* standard. *Palazzolo*, 533 U.S. at 616. As relevant here, the Rhode Island Supreme Court rejected both theories of regulatory taking for the reason that the challenged state regulations had been in place prior to the petitioner's acquisition of the property in 1978. *Id.*

The Supreme Court reversed in pertinent part, rejecting a blanket rule that "[a] purchaser or a successive title holder like petitioner is deemed to have notice of an earlier-enacted restriction and is barred from claiming that it effects a taking." *Id.* at 626. The Court reasoned that

> [j]ust as a prospective enactment, such as a new zoning ordinance, can limit the value of land without effecting a taking because it can be understood as reasonable by all concerned, other enactments are unreasonable and do not become less so through passage of time or title. . . . Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

*Id.* at 627. Faced with the argument that *Lucas* stood "for the proposition that any new regulation, once enacted, becomes a background principle of property law which cannot be challenged by those who acquire title after the enactment," the Court sidestepped the issue:

> We have no occasion to consider the precise circumstances when a legislative enactment can be deemed a background principle of state law or whether those circumstances are present here. It suffices to say that a regulation that otherwise would be unconstitutional absent compensation is not transformed into a background principle of the State's law by mere virtue of the passage of title.

*Id.* at 629–30.  The Court remarked, however, that "[a] law does not become a background principle for subsequent owners by enactment itself" and explained that "[t]he determination whether an existing, general law can limit all economic use of property must turn on objective factors, such as the nature of the land use proscribed." *Id.* at 630.

Taken together, these two cases illuminate a few things.  The upshot of *Lucas*, for our purposes, is that the deprivation of the right to use property for a particular purpose is not a "taking" if that right was never a part of the titleholder's bundle of rights to begin with.  505 U.S. at 1027.  And *Palazzolo* teaches that although a land-use regulation may restrict the titleholder's use of their property, even land-use regulations that predate the acquisition of title do not automatically remove the right to use the property for a given purpose from the bundle of rights held by the titleholder.  533 U.S. at 627.  Together, the cases call for a searching inquiry into "background principles of the State's law of property and nuisance already place[d] on land ownership," *Lucas*, 505 U.S. at 1029, and "objective factors, such as the nature of the land use proscribed," *Palazzolo*, 533 U.S. at 630, to determine whether the plaintiff actually held the property interest that they claim to have been taken.  *See also Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2076, 2079 (2021).  The cases make clear that "[a] law does not become a background principle . . . by enactment itself," but they do not rule out the possibility that legislative enactments such as zoning ordinances can achieve the status of a "background principle of state law" that might deprive the titleholder of their claimed use interest.  *Palazzolo*, 533 U.S. at 629–30; *see also Cedar Point Nursery*, 141 S. Ct. at 2076, 2079.

Thus, although the City is incorrect in asserting that the Trust lacks a cognizable property interest for takings purposes on account of the discretionary nature of the City's denial of the Trust's application for rezoning, neither is the Trust correct that its ownership of the land in question automatically establishes the property interest needed to pursue its takings claim.

In the absence of arguments below or before us as to the proper application of *Lucas* and *Palazzolo* to the case at hand, we are unable conclusively to resolve the issue.  It is enough to say that the district court erred in applying substantive-due-process precedent to determine whether the Trust holds a property interest sufficient to support its takings claim.  The City's motion for judgment on the pleadings depended entirely on the discretionary nature of its authority to deny

the Trust's application for rezoning.   Because the City's authority to deny discretionarily an application for rezoning does not preclude the Trust from holding a property interest sufficient to support its takings claim, the district court erred in granting the City judgment on the pleadings on this claim.

In so holding, we in no way suggest that the Trust's takings claim will ultimately prevail. Indeed, we are highly skeptical of its claim that the City's residential zoning of the Trust's property has left the property "economically idle" given that the Trust may still construct 13 single-family residences upon its 16 acres.  *See Palazzolo*, 533 U.S. at 631 ("A regulation permitting a landowner to build a substantial residence on an 18-acre parcel does not leave the property 'economically idle.'").   And we are similarly skeptical that the Trust's claim will prevail under *Penn Central*.   Although the landowner's reasonable investment-backed expectations factor may not be dispositive, it would seem to weigh heavily against the Trust in this case, given the Andrews' longstanding ownership of the property.  *See Penn Central*, 438 U.S. at 124–25; *Murr*, 137 S. Ct. at 1945 ("A reasonable restriction that predates a landowner's acquisition, however, can be one of the objective factors that most landowners would reasonably consider in forming fair expectations about their property.").  Because, however, the City did not challenge the merits of the Trust's regulatory takings claims until this appeal, we decline to consider those arguments in the first instance.  *See Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1072 (6th Cir. 1993) ("This court does not normally address issues raised for the first time on appeal.").

## B.  Equal Protection

The Equal Protection Clause "is 'essentially a direction that all persons similarly situated should be treated alike.'"  *EJS Properties*, 698 F.3d at 864 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis."  *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quotation omitted).  The Trust is not part of a suspect class nor does it argue any longer that the City's failure to rezone the Trust's land burdens a fundamental

right; instead, the Trust's equal-protection claim proceeds upon a "class of one" theory "where the plaintiff alleges that the state treated the plaintiff differently from others similarly situated and that there is no rational basis for such difference in treatment." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005).

The Trust argues that its property is similarly situated to at least the Woodlands of Mentor, which the City approved for rezoning to RVG in 2017, and that the City lacked a rational basis for denying the Trust's substantially identical application for rezoning just two years later. The district court assumed without deciding that the Trust's property was similarly situated to the Woodlands of Mentor but held that the Trust failed to allege facts showing that there was no rational basis for the City's disparate treatment of the property. *Andrews*, 2020 WL 5423964, at *12–13. We disagree and hold that the Trust has pleaded a viable class-of-one claim.[1]

***Similarly Situated.***   "When evaluating whether parties are similarly situated, 'courts should not demand exact correlation, but should instead seek relevant similarity.'" *EJS Properties*, 698 F.3d at 864–65 (quoting *Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir. 2000)). The Trust alleges that both its property and the Woodlands of Mentor each consist of approximately sixteen acres of land and that the Trust planned to use the land for the development of a materially similar number of residential units—forty for the Trust's Echo Hill Manor Subdivision and thirty-seven for the Woodlands of Mentor—leaving a five acres of open space. *See* R. 1 (Compl. at ¶¶ 25–29) (Page ID #7–8). Both proposed developments, moreover, would have two access points to public roads and fit the maximum density requirements for RVG-zoned property. *Id.* at ¶¶ 29, 31 (Page ID #8). Indeed, the Trust alleges that the plats for both developments are "materially identical" and were prepared by the same engineering firm. *Id.* at ¶¶ 27, 30 (Page ID #7–8). These allegations are sufficient to satisfy the "similarly

---

[1]As we have noted before, it is an open question whether a class-of-one claim based on discretionary acts like the City's denial of the Trust's application for rezoning remains viable in the wake of the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 594 (2008) (holding that a class-of-one equal-protection claim cannot be raised in the public-employment context based in part upon the discretionary nature of the employment decisions). *See EJS Properties*, 698 F.3d at 864 n.15. We do not answer that question here, however, given that neither party has addressed it.

situated" requirement for a class-of-one claim at the pleading stage. *See EJS Properties*, 698 F.3d at 864–65.

The City's arguments to the contrary are unavailing. The only difference between the two properties that the City points to as material is the two years that elapsed between the City's approval of the rezoning of the Woodlands of Mentor in 2017 and the City's denial of the Trust's application in 2019. Appellee Br. at 19–20. To be sure, in *EJS Properties*, we concluded that "[g]aps in time" may preclude a finding that two properties are similarly situated. 698 F.3d at 865–66. We explained, however, that the reason for the rule was to account for the possibility of a "change in policy" during the intervening period "rather than differential treatment." *Id.* at 866. Here, the Trust alleged that the City's 2011 Comprehensive Plan—which the Trust reads to encourage RVG development—was in place at all relevant times. R. 1 (Compl. at ¶¶ 10–11) (Page ID #3). In contrast, the City has pointed to nothing to suggest that the relevant policies changed between 2017 and 2019. Thus, the City's argument that the two properties are not similarly situated fails to warrant judgment on the pleadings in its favor.

Otherwise, the City argues (briefly) that "[t]he Trust has provided no details regarding the location of [the Woodlands of Mentor] relative to [the Trust's] proposed development or the character of the surrounding neighborhoods, all of which may be considered by [the City] when considering a discretionary rezoning request." Appellee Br. at 20. To be sure, these sorts of considerations—location and the character of the neighborhood—are relevant to the City's determination of whether to grant or deny a request for rezoning. *See City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 732 (1995). But it does not follow that the Trust has failed plausibly to plead that its property is similarly situated to the Woodlands of Mentor.

Further allegations regarding the location and character of the neighborhoods surrounding the Woodlands development would shed light on the extent to which *the Woodlands* changed (or did not change) the character of its surrounding area. We know, however, that the City approved the rezoning application for the Woodlands. That means one of two things: either (1) the City concluded that the development would not impact the character of the surrounding area or (2) the City concluded that the development was worthwhile even if it did change the character of the surrounding area. If it were the former, then the Trust has adequately pleaded that its property is

similarly situated by alleging that its proposed development "will not change the character of the [surrounding] area," an allegation that the City does not challenge at this stage. R. 1 (Compl. at ¶ 34) (Page ID #8); *see also id.* at ¶¶ 22–24 (specific allegations regarding the area surrounding the Trust's property).**[2]** If it were the latter, however, then that would put the Trust's property in a *superior* position to the Woodlands, and the difference between the properties would not be "relevant" or "material" because it would not give the City a reason to grant the Woodlands' application but deny the Trust's. *See TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005); *Johnson v. Morales*, 946 F.3d 911, 939–40 (6th Cir. 2020). Thus, the Trust's failure to plead facts regarding the precise location of the Woodlands development and the exact character of the surrounding neighborhoods is not fatal to the Trust's class-of-one claim.**[3]**

In so holding, we acknowledge that the Trust's class-of-one claim will yet need to clear high hurdles to prevail. *See Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("The 'similarly situated' requirement must be enforced with particular rigor in the land-use context because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.'" (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (Breyer, J., concurring))). The City will have ample opportunity to develop a factual record regarding the

---

**[2]**The dissent characterizes the Trust's allegation that its development would not change the character of the surrounding neighborhood as "conclusory." Dissent at 22. We respectfully disagree. The Trust has supported its allegations by characterizing the surrounding area as one that has RVG developments interspersed with R-4 zones, *see* R. 1 (Compl. at ¶¶ 18–24) (Page ID #5–7), and attached maps to its complaint in support its allegations, *see* R. 1-9 (Map of Surrounding Area) (Page ID #68). Based on the materials attached to the Trust's complaint, the City may have been able to challenge the Trust's allegation regarding the character of the neighborhood. But the City chose not to raise that challenge at this stage. That being the case, we must conclude that the Trust has adequately pleaded—though certainly not established—that its development would not change the character of the surrounding neighborhood.

**[3]**The dissent identifies a number of characteristics of the Trust's proposed development that could have informed the City's decision not to approve the Trust's rezoning application—preserving "uniformity between adjacent developments," maintaining "tranquility and privacy," or protecting the investments of abutting landowners—and posits that if the Woodlands of Mentor lacked similar features then the properties would not be similarly situated. Dissent at 24. Again, however, despite the relevant features of the Trust's proposal being apparent from the pleadings, the City did not challenge the Trust's fairly supported allegation that its development would not impact the character of the neighborhood. Thus, for the reasons already given, any hypothetical differences that may have existed regarding the Woodlands of Mentor are not dispositive. More broadly, the dissent calls for a fact-intensive inquiry that is ill-suited to the pleadings stage even though the Trust bears the ultimate burden of proof. *See Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 n.3 (6th Cir. 2005). The better vehicle for arguments like the dissent's is summary judgment, where the City will no doubt flesh out the nuanced differences between the Trust's proposed development and the Woodlands of Mentor. *See id.* It may well prevail if so.

two properties (and the others that the Trust has identified) that elaborates on these and other potentially material differences between them; if it does, nothing forecloses the City from raising similar arguments at a later stage of the case, such as summary judgment, that allows for a more fulsome comparison.  But at the pleading stage, all that we require of the Trust are plausible allegations that its property is similarly situated to the Woodlands of Mentor.  *See Iqbal*, 556 U.S. at 678; *Johnson*, 946 F.3d at 939–40.  The Trust has cleared that hurdle, at least in the face of the City's arguments here.

*No Rational Basis.*  "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negat[ing] every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will."  *Warren*, 411 F.3d at 711.  The Trust has not pleaded any animus or ill-will by the City, arguing instead that the City lacked any conceivable rational basis for approving the rezoning of the Woodlands of Mentor but not the Trust's property.

The district court rejected the Trust's argument, holding that the Trust failed to state a viable class-of-one equal-protection claim because it failed to allege facts "in its Complaint to negate potential explanations for the City's decision" to deny the Trust's application for rezoning while granting the application for the Woodlands of Mentor.  *Andrews*, 2020 WL 5423964, at *13.  The district court did not, however, identify the potential explanations that may have justified the City's disparate treatment of the Trust's property and the Woodlands of Mentor.  Instead, it relied on *In re City of Detroit*, 841 F.3d 684 (6th Cir. 2016), for the proposition that "[u]nder the rational basis standard, government action is afforded a strong presumption of validity" and "'[t]o survive a motion to dismiss' in the rational basis context, 'a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.'"  *Andrews*, 2020 WL 5423964, at *12 (quoting *City of Detroit*, 841 F.3d at 701).  The court granted the Trust leave to amend, *id.* at *13, but the Trust stood on its original pleading, arguing that it could not allege facts to rebut an explanation that the City had not presented.  *See* R. 19 (Mot. Final J. at 1) (Page ID #187).

The Trust contends that the district court erred in applying *City of Detroit* at all—arguing that the case applies only to disparate legislative classifications and not disparate treatment in

adjudicative forums—and that, in any event, the allegations in its complaint satisfy the pleading standard described in *City of Detroit*. Appellant Br. at 28–31; Reply Br. at 19–23. Because we agree with the Trust that its pleadings would satisfy the rational-basis pleading standard described in *City of Detroit*, we assume without deciding that it applies here.

In *City of Detroit*, we faced an equal-protection claim alleging that Detroit treated residential and commercial water customers disparately by shutting off water service for delinquent residential customers but not delinquent commercial customers. 841 F.3d at 689. The bankruptcy court below had dismissed the equal-protection claim for failure to state a claim, presenting us with a question as to what a plaintiff must allege to state a viable equal-protection claim. *Id.* at 702. Concluding that Detroit's disparate treatment did not implicate a suspect class or burden a fundamental right, we concluded that the rational-basis standard governed the claim. *Id.* at 701. This was, we said, "an uphill climb" for the plaintiffs, given that "[u]nder the rational basis standard, government action is afforded a strong presumption of validity, and we will uphold it as long as 'there is a rational relationship between the disparity of treatment and some legitimate government purpose.'" *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Consistent with the presumption of validity, we explained that "the burden is on plaintiffs to negate 'every conceivable basis which might support'" the government's disparate treatment. *Id.* (quoting *Heller*, 509 U.S. at 320).

We rejected the plaintiffs' argument that this presumption of validity does not apply at the pleadings stage and held that "[t]o survive a motion to dismiss" in the rational-basis context, "a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Id.* (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)). The plaintiffs failed to do so, we held, because their operative complaint "include[d] no facts rebutting the likely non-discriminatory reasons [Detroit] may treat residential and commercial customers differently." *Id.* at 702. The district court had identified several possible reasons—such as the possibilities that "commercial water customers have more complex service connections," are more likely to pay past-due bills, and that Detroit might wish to avoid "causing layoffs and other undesirable economic consequences" by shutting off a business's water supply—none of which the plaintiffs had rebutted with factual allegations. *Id.*

In holding that the plaintiffs failed to state a rational-basis equal-protection claim, we contrasted their pleadings with those of the plaintiff in *Bower v. Village of Mount Sterling*, 44 F. App'x 670 (6th Cir. 2002), who successfully alleged an equal-protection claim that a village had denied him "the opportunity to become a full-time police officer in the same manner as other [v]illage officers." *City of Detroit*, 841 F.3d at 701–02 (quoting *Bower*, 44 F. App'x at 672). We reasoned that unlike the plaintiffs in *City of Detroit*, the plaintiff in *Bower*

> overcame "the presumption of rationality" in the defendants' decision by alleging facts that negated the two most likely non-discriminatory reasons defendants declined to hire him: a prior sexual harassment complaint, and the mayor's statement to Bower's supervisor that the Village council could not appoint him to a full-time position because appointing officers was not a council function.

*City of Detroit*, 841 F.3d at 701 (quoting *Bower*, 44 F. App'x at 675–76, 678).

The upshot of *City of Detroit* is that in order to overcome the presumption of rationality that applies to the government's disparate treatment in the rational-basis context, a plaintiff must plead facts that plausibly negate the defendant's "likely non-discriminatory reasons" for the disparate treatment. *City of Detroit*, 841 F.3d at 702; *see also Bower*, 44 F. App'x at 678. The problem for the City of Mentor is that neither the City nor the district court identified the likely non-discriminatory reasons for the disparate treatment of the Trust's property and the Woodlands of Mentor that the Trust purportedly failed to rebut. Indeed, on appeal, the City has doubled down, relying entirely on the general proposition that its decision to deny the Trust's application for rezoning is entitled to a presumption of validity without pointing to any conceivable justifications for approving the rezoning of the Woodlands of Mentor but not the Trust's property. *See generally* Appellee Br. at 18–22. While it is true that under *City of Detroit* the City need not "produce evidence to sustain the rationality" of its decision, 841 F.3d at 701, it does not follow that the City can obtain judgment in its favor without so much as identifying a single rational explanation for its disparate treatment of similarly situated properties.

It cannot be that the Trust must concoct and rebut a potentially valid rationale for the City's action in order to survive the pleadings stage where the City itself has failed to do so; otherwise, the Trust's complaint would fail to state a claim even if it proves to be one of those few-and-far-between cases where the defendant's conduct truly lacks a rational basis. *See, e.g.*,

*Stemler v. City of Florence*, 126 F.3d 856, 874 (6th Cir. 1997). In *City of Detroit* and *Bower* the district court had identified the "likely non-discriminatory reasons" for disparate treatment; without the City pointing to those reasons here, we have no basis for rejecting the Trust's class-of-one equal-protection claim on the pleadings. The only potential basis that the City has gestured at—in arguing that the Trust's property is not similarly situated to the Woodlands of Mentor—is the two-year gap between the two applications for rezoning. But as we have already explained, the significance of that gap pertains to the potential for an intervening change in policy, which the Trust's allegations sufficiently rebut. *See EJS Properties*, 698 F.3d at 864–65. Accordingly, the district court erred in granting the City's motion for judgment on the pleadings as to the Trust's class-of-one equal-protection claim.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

LARSEN, Circuit Judge, concurring in part and dissenting in part. I concur in the majority's resolution of the Trust's takings claim. But I would hold that the Trust has not adequately alleged its class-of-one equal-protection claim.

A plaintiff bringing a class-of-one claim faces an "uphill climb" from the start. *Lyda v. City of Detroit (In re City of Detroit)*, 841 F.3d 684, 701 (6th Cir. 2016); *see Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1217–18 (10th Cir. 2011). We evaluate such claims using rational-basis review. *Warren v. City of Athens*, 411 F.3d 697, 710–11 (6th Cir. 2005). And that means the challenged "government action is afforded a strong presumption of validity." *City of Detroit*, 841 F.3d at 701. The plaintiff cannot prevail unless he shows that "the varying treatment of different . . . persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000) (alteration in original) (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). And "[t]he burden falls squarely to the plaintiff" to make this difficult showing at the outset. *Club Italia Soccer & Sports Org., Inc. v. Charter Township of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006); *see Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). That is, his complaint "must overcome the presumption of rationality by alleging that the defendant acted in a manner clearly contrary to law." *Club Italia*, 470 F.3d at 298; *see City of Detroit*, 841 F.3d at 701.

This is no easy task. We have held that—even at the pleadings stage—class-of-one plaintiffs "must show not just that they were treated differently than others outside of their 'class' but that, in comparison to those outside their class, they were 'similarly situated *in all relevant respects*.'" *Anders v. Cuevas*, 984 F.3d 1166, 1180 (6th Cir. 2021) (emphasis added) (quoting *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020)); *accord Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011). Other circuits impose the same stringent pleading requirement. *See, e.g.*, *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177,

198 (2d Cir. 2019); *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 639–40 (1st Cir. 2013); *Kan. Penn Gaming*, 656 F.3d at 1217–20; *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204–05 (11th Cir. 2007); *Martinez v. New Deal Indep. Sch. Dist.*, 802 F. App'x 98, 100 (5th Cir. 2020) (per curiam); *Joey's Auto Repair & Body Shop v. Fayette County*, 785 F. App'x 46, 49 (3d Cir. 2019).

Additionally, the requirement that identified "comparators be 'similarly situated in *all material [i.e., relevant] respects*' is inevitably more demanding where a difference in treatment could legitimately be based on a number of different factors." *Kan. Penn Gaming*, 656 F.3d at 1218. And it is therefore particularly onerous in a discretionary rezoning case like this one, where the government must balance a "complex and multidimensional" set of conflicting considerations in making its decision. *Carruth v. Bentley*, 942 F.3d 1047, 1058 (11th Cir. 2019); *see also Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("The 'similarly situated' requirement must be enforced with particular rigor in the land-use context because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.'" (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (Breyer, J., concurring))).

Applying these standards, the Trust's complaint does not "adequately plead that the government treated [it] disparately as compared to [any] similarly situated" property owner. *Napolitano*, 648 F.3d at 379 (internal quotation marks omitted). It alleges some facts about the Woodlands of Mentor. But as the City points out, the Trust has provided no details regarding either the location of this development relative to the Trust's proposed development or the character of the neighborhood surrounding the Woodlands property. "Those silences are fatal to [the Trust]'s claim." *NRP Holdings*, 916 F.3d at 198. It is beyond dispute that the location of properties and the character of their surrounding neighborhoods are "relevant respects" for the City's rezoning decisions. *See, e.g.*, *Mensie v. City of Little Rock*, 917 F.3d 685, 692 (8th Cir. 2019) (failure to identify similarity in "all material respects," including "location"); *Parker Ave., L.P. v. City of Philadelphia*, 660 F. App'x 156, 159 (3d Cir. 2016) (upholding the dismissal of a complaint where the plaintiff failed to "allege whether the approved [paving] ordinances were similar regarding their locations or surroundings"). These quintessential zoning considerations constitute "factors that an objectively reasonable governmental decisionmaker would have found

relevant in making the challenged decision."**1**  *Griffin*, 496 F.3d at 1203.  And the majority concedes as much.  *See* Majority Op. at 14 (citing *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 732 (1995)).

That should be the end of the Trust's equal-protection claim.  The Trust has "fail[ed] to state a claim by omitting key factual details in alleging that it is 'similarly situated' to [the Woodlands of Mentor]."  *Griffin*, 496 F.3d at 1205; *see, e.g.*, *NRP Holdings*, 916 F.3d at 198; *Hu v. City of New York*, 927 F.3d 81, 100–01 (2d Cir. 2019); *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008); *Parker Ave.*, 660 F. App'x at 159; *Joey's Auto Repair*, 785 F. App'x at 49.  Without more, we are simply left to speculate as to whether the City might be liable—even after accepting all of the Trust's allegations as true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

The Trust, for its part, makes no effort to counter the City's argument regarding the complaint's deficiency with respect to location and surroundings.  But the majority offers a number of responses, none of which persuades.  First, it quotes the complaint's claim that the Trust's development "will not change the character of the area."  R. 1, PageID 8.  But we need not accept this type of bald and "conclusory allegation" as true.  *D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Second, the majority reasons that the City "will have ample opportunity to develop a factual record" revealing the material details that the Trust has omitted from its complaint. Majority Op. at 15.  Maybe so.  But the Supreme Court has told us that doesn't matter.  "It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be

---

**1**The City's comprehensive plan bears this out.  It provides in broad, general terms that each site "must be evaluated for density and housing type suitability on [its] own merits and in accordance with the other policies and general design concepts of th[e] plan." R. 1-7, PageID 63.  And those policies expressly account for the needs and character of surrounding subdivisions. *See, e.g.*, R. 1-7, PageID 63 (articulating the City's policy to "[r]equire use of buffers between various residential density developments"); Comprehensive Plan at 71 (stating that zoning decisions should "[p]romote visual compatibility among adjacent developments"); *see also* M.C.O. § 1125.01 (providing that the City will strive to "protect the character and values" of residential areas when making zoning decisions); *id.* §§ 1137.04, 1137.06(c) (requiring rezoning applicants to provide "the names and addresses of the owners of property contiguous or directly across the street from the subject property" and to give them "written notice" of the public hearing regarding the matter).

weeded out early in the discovery process . . . ." *Twombly*, 550 U.S. at 559; *see Iqbal*, 556 U.S. at 684–85. To withstand dismissal, the plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible *on its face*." *Twombly*, 550 U.S. at 570 (emphasis added); *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 557)).

Third, the majority faults the City for its limited argument on appeal. Majority Op. at 16; *see also id.* at 15 n.2. In doing so, however, it wrongfully "shift[s] the burden" to the defendant. *Club Italia*, 470 F.3d at 299. Because the Trust's class-of-one claim is subject to rational-basis review, the City need not say a thing. *Id.*; *see also Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018) ("That standard places a heavy burden on [the plaintiff] to 'show there is no rational basis' for the [disparate treatment]; by the same token, Defendants 'need not offer any rational basis so long as this Court can conceive of one.'" (emphasis omitted) (quoting *Ziss Bros. Constr. Co. v. City of Independence*, 439 F. App'x 467, 476 (6th Cir. 2011))); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 318–19 (1993). The only thing that matters is that *the Trust* has failed to meet its "exacting burden[]" of "demonstrat[ing] similarity." *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1213 (10th Cir. 2006). And in any event, the City has itself identified the Trust's failure to allege similarity in the relevant respects of location and surrounding character.

Fourth, the majority notes that any effect the Woodlands may have had on its surroundings did not cause the City to deny the Woodlands' rezoning request. *See* Majority Op. at 14. But that observation avoids the salient issue. Each of the City's rezoning decisions is made, "not by an abstract consideration of the [development] considered apart, but by considering it in connection with the circumstances and the locality." *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926); M.C.O. §§ 1125.01, 1137.01. In other words, zoning is a necessarily relative endeavor. And one cannot determine how a particular development will affect the surrounding area without knowing what that area looks like. *See Euclid*, 272 U.S. at 388; *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 433–34 (1989) (Stevens, J., concurring).

Thus, the Trust has not sufficiently alleged that it is "similarity situated" to the Woodlands simply by describing the properties surrounding the Trust's *own* proposed development (Echo Hill). We must also know something about the properties surrounding *the Woodlands*. Otherwise, we cannot determine whether differences between the Woodlands' surroundings and Echo Hill's surroundings might have provided the City with "a rational reason for voting differently" on the rezoning requests. *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012). We have no way of knowing how the calculus plays out in this case; the Trust has described only one side of the equation.

Indeed, the specific allegations in the complaint only serve to show why the Trust's failure to describe the location and surrounding character of the Woodlands is a material omission. The Trust alleges that its own property—presently zoned R-4—is sandwiched between two other R-4 developments on the same side of the street. *See* R. 1-9, PageID 68. By itself, that provides several obvious rational bases for the City's action. First, refusing to up-zone the Trust's property could rationally advance a legitimate aesthetic interest by helping to maintain visual uniformity between adjacent developments. *See Berman v. Parker*, 348 U.S. 26, 33 (1954); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981); *H.D.V. - Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009). Second, by limiting the density of nearby homes, the City's action could rationally further a legitimate interest in maintaining tranquility and privacy for those residents in the abutting R-4 neighborhoods. *See City of Memphis v. Greene*, 451 U.S. 100, 127 (1981); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9 (1974). And third, the City's denial might rationally advance a legitimate interest in protecting the investments made by homeowners who believed their property would border a more wide-open R-4 development. *See Shoemaker v. City of Howell*, 795 F.3d 553, 567 (6th Cir. 2015); *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 793 (6th Cir. 1996).

Unless the Woodlands is similarly nestled between R-4 subdivisions, any of these reasons would likewise provide rational bases for the alleged difference in treatment. Such a difference in surroundings would rationally permit the City to treat the Woodlands differently. *See EJS Props.*, 698 F.3d at 865. But the complaint is noticeably silent as to this material consideration in the City's rezoning decision. Without this critical allegation of similarity in a plainly relevant

respect, the Trust's "complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). The pleading standard expressed in *Twombly* and *Iqbal* demands more. *See Kan. Penn Gaming*, 656 F.3d at 1219–20. Accordingly, the Trust's class-of-one claim must be dismissed.

This conclusion is further reinforced by the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008). There, the Court explained that:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.* at 603. As the majority notes, "[w]e have not expressly addressed whether [*Engquist*] renders invalid class-of-one actions challenging discretionary zoning decisions, such as the one here." *Shavers v. Almont Township*, 832 F. App'x 933, 937 n.2 (6th Cir. 2020).[2] But even though *Engquist* was a public-employment case, the concerns here are analogous: "Local land use decisions are a quintessential example of subjective and individualized action by decisionmakers vested with the discretion needed to balance competing interests." *Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 695 (4th Cir. 2018). And, at least in Mentor, there are just no "clear standard[s] against which departures, even for a single plaintiff, [can] be readily assessed." *Engquist*, 553 U.S. at 602; *see* M.C.O. § 1137.01 (providing that the City "may" rezone property where "the public necessity, convenience, general welfare, or good zoning practices require"). The City's rezoning decisions are "inherently subjective." *Tollbrook, LLC v. City of Troy*, 774 F. App'x 929, 935 (6th Cir. 2019). And the Court has cautioned that "[i]t is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Engquist*, 553 U.S. at 604.

---

[2]At least one district court in this circuit was "unpersuaded" that "inherently discretionary zoning decisions" present cognizable class-of-one claims in the wake of *Engquist*. *Tuscola Wind III, LLC v. Almer Charter Township*, 327 F. Supp. 3d 1028, 1046–47 (E.D. Mich. 2018).

That said, without briefing from the parties, I would not—and do not purport to—decide whether *Engquist* totally forecloses class-of-one claims in the discretionary zoning context. But at the very least, *Engquist* confirms that where the government's decisionmaking "rest[s] on a wide array of factors that are difficult to articulate and quantify," *id.*, as in this case, it is extraordinarily difficult for a plaintiff to state a class-of-one claim. *See also id.* at 608 ("We agree that, even if we accepted Engquist's claim, it would be difficult for a plaintiff to show that an employment decision is arbitrary."); *Kan. Penn Gaming*, 696 F.3d at 1217; *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009).

\* \* \*

In sum, even if the Trust's class-of-one claim is cognizable, it has not met its "'substantial burden'" of showing that "others 'similarly situated in *all* material respects' were treated differently and that there [was] no objectively reasonable basis for the [City]'s action." *Kan. Penn Gaming*, 696 F.3d at 1217 (emphasis added) (quoting *Jicarilla Apache Nation*, 440 F.3d at 1212). That warrants dismissal.

Thus, insofar as the majority revives the Trust's class-of-one claim, I respectfully dissent.